Ready for argument now in the case of United States v. DeHaan. Ms. Masters. Good morning, Your Honor, and may it please the Court. This is a case in which the Court sentenced the defendant, Charles DeHaan, for health care fraud based on a theory that he fraudulently certified 305 patients for home health care when in fact the conduct the government relied upon did not actually violate the law. Today I will address how the government propounded and the Court adopted an erroneous legal theory as to what is required to certify a patient as being under the care of a physician for purposes of a valid home health care certification. And even if the Court was correct on the law, the government propounded and the Court adopted a loss calculation methodology that allowed Medicare to claim it suffered a monetary loss of $2.8 million without any evidence that it had paid for any unnecessary services. And to clarify before proceeding, just to reiterate from the briefs, Mr. DeHaan does not challenge the loss calculation of $478,000 that is related to overbilling for patients. And I'm going to rest on the briefs regarding restitution, which is the same amount as the $2.8 million, unless this Court has questions. In order to authorize home health care, a physician must sign a certification that such services are or were required because the patient is confined to his home. A physician has established a plan of care and periodically reviews the plan, and such home health care services, quote, are or were furnished while the individual was under the care of the physician. And that is the statutory requirement under 42 U.S.C. 1395F. As Mr. DeHaan quotes extensively in the briefs from the sentencing hearing, the government adopted the position that the, quote, under the care of a physician requirement could only be satisfied if a physician personally met with the patient. That contention was flat. But isn't it fairly clear from the transcript that Judge Capella himself did not think it was necessary for Dr. DeHaan to have had a face-to-face encounter with each patient he certified as homebound? And his written order seems to make clear that he understood that the relevant question was whether the patient was under Dr. DeHaan's care. Your Honor, I think if I'm understanding your question correctly, the court asked counsel for the government multiple questions about couldn't you establish that someone was under the care of a physician through other means? Couldn't you know about that patient's health status? And the prosecutor acted, responded inaccurately, no, that's not the case, that a patient visit was required. And that was simply not correct because the requirement that a doctor meet with the patient or someone meet with the patient before certifying came into effect in 2011 under the Affordable Care Act. Prior to that, there was no such requirement of a face-to-face meeting in order to certify a patient as being under your care. And even when that requirement went into effect, which was January 1st of 2011, someone other than the doctor, a nurse practitioner for instance, could conduct that meeting and the doctor could rely upon it in certifying. And so one of what we find so troubling in this case is that what was not before the court, the court had all of these questions about, well, can't you know about a patient's health care status from something other than a visit and certify that they're under your care? And the prosecutor answers no to that, but in fact, that was inaccurate. The Medicare Benefits Policy Manual also states that, quite specifically, that it is not required for coverage that the physician who signs the plan of care see the patient. And that is under the definition of under the care of a physician. That provision was not provided to the court, so it's troubling that the provision is not provided to the court. The court has a lot of questions in which it seems to think maybe what the government is saying is not correct. And then ultimately, it does adopt that position. But as a matter of law, that physician was incorrect. And a physician's failure to meet with a patient simply does not, standing alone, render a health care certification fraudulent. And in fact, I would also point out to the court that the indictment here and the plea that Mr. Jahan, when he pled guilty, was that he knew patients, he certified patients as homebound, who he knew were not homebound or had never met the patient and, and this is the part that was read out of the entire sentencing hearing, and was not familiar with their health status. Now that and part, that end part about was not familiar with their health status, comports with the law, which allows a doctor to find out about someone's health status through other means. There's also, I think, a really big irony here in the government's brief, where they cite the Eccles case out of the Fifth Circuit. And I mean, as we point out, it's an unpublished opinion from another circuit. But in that case, the court actually acknowledges that a doctor, at least in the Fifth Circuit, could become familiar with another person's health care by corresponding with the patient. So the fact, standing alone, that Dr. Jahan did not meet these 305 people, is not enough to show that his certifications were fraudulent. And because that is the only basis on which the court found the certifications fraudulent, that the court commits an error of law, and they could err as a sentence on that reason alone, should, is appropriate. And, in fact, as we ask, and the government has not contested this, any remand should just be to resentence without any further hearing on loss calculation on the $487,000 to which Mr. Jahan does not contest. In the alternative, even if the 305 certifications were fraudulent, the court's improper loss calculation methodology also requires vacatur and resentencing. The prosecutor has the burden of proof of establishing monetary loss, and here the methodology adopted required no evidence that Medicare suffered a financial loss. The government admitted it did not know whether any of the 305 certified patients received, and therefore Medicare paid for, unnecessary services. The government took the position literally, and we put this in our brief as well, that maybe they were homebound, maybe they weren't, and it simply didn't matter because it was the government's position that it suffered a loss because it would not have paid on certifications if it had known they were fraudulent. But that's not a statement of loss. I mean, hopefully most people are not going to pay out on a bill if they think there's something fraudulent about it. Medicare's mandate is to pay for services for patients who are truly homebound. And the government had the burden of eliciting evidence that DeHaan's conduct actually caused it to pay for unnecessary services, and it did not do that in this case. Additionally, the loss methodology improperly assumed without any evidence unlawful conduct by the home health care agencies. In other words, Mr. DeHaan is being held responsible for home health agency bills without any proof because we don't know anything about these 305 people. We know nothing about their health care status. Why is it reasonable to think that even if he never billed Medicare for any medical services to the 305 patients, that these patients still might have been under his care? That doesn't compute, does it? I'm not quite sure I understand your question. I think I agree with you, though. I think that you can't assume that these 300... Yeah, okay, go ahead. Well, what we are alleging is improper is there was no evidence. And there has to be but-for causation and legal causation of loss to Medicare. And when the government comes in and says, it doesn't matter whether these people were homebound or not, the government is saying we don't have to pay for necessary services. It doesn't matter. We still suffered a loss even if the people who were certified required the services. Well, like, is it your position that a patient could have been under his care and yet all of the services were provided by a nurse practitioner or some other professional with no billing by Dr. DeHaan? You cut out a little bit. I'm sorry, with no billing by Dr. DeHaan? Well, he billed for certifying the patient for services, yes. There's a code, a G code, that can be used to bill for certifying a patient for home health care. And he could rely on a visit by a nurse practitioner to tell him about the person's health care status, and then he could certify for home health care, and then the home health care agencies would submit bills. And what the loss calculation is based upon, the theory that all of the services provided by the home health care agencies were unnecessary without any evidence as to whether they were or they weren't. So in essence, even if Mr. DeHaan's certifications were improperly done or fraudulent, the loss should still be measured in terms of whether Medicare provided unnecessary services, and that did not happen here. I see I'm into my rebuttal, so if there's no further questions. Certainly, Ms. Masters. Mr. Paganini. May it please the Court, my name is Scott Paganini and I represent the United States. Excuse me. Your Honors, the District Court made a conservative and reasonable estimate of the loss caused by the defendants. The District Court took a small number of patients and narrowed that small number down to a subset of 305 patients. Now, that 305 patients, the District Court found, represented patients that were not under the defendant's care when the defendant certified them for home health services. Is there a possibility that any of the patients listed on Exhibit 94C could have been under Dr. DeHaan's care without him billing Medicare for any medical services? Could a nurse practitioner under his supervision have been providing those services for people? No, Your Honor. And I would let the Court know that during the sentencing hearing, there was evidence that came out that Dr. DeHaan, early on in the stage, had a nurse practitioner. But throughout the proceeding, there was no evidence that he had any other nurse practitioners. And if you look at the plea with regard to the patient, Ms. Jefferson, even specifically as part of the factual basis, the plaintiff alleges that at the time he certified Ms. Jefferson, who isn't even counted as part of this loss, he did not have any nurse practitioners or PAs, assistants, who under the Illinois law couldn't bill for visits anyway. And it's the evidence, the 305 patients, combined with the defendant's admissions that the District Court looked at. The defendant admitted that the home health agencies tell him which patients to certify, and he certified them. And the defendant admitted that he never actually met the patients, and that he wasn't familiar with their health status, and that he knew some of the patients that he certified for home health services weren't actually homebound, and he was going to have problems with that. Now, the Medicare benefits manual that the defendant refers to says a patient is expected to be under the care of the physician who signs the certification. So it says there that they're expected to be under the care. Now, under the care of a physician doesn't start at the time of certification. And it says the next sentence, it says it is expected but not required that the physician will visit the patient. Well, what that is essentially saying is once a plan of care of this is established, that the physician doesn't have to visit the patient because the home health agencies are dealing with them. But the prior sentence says that a patient is expected to be under the care of the physician who signs the certification. So how can the defendant have signed certifications claiming these patients are under his care when he doesn't know anything about them? And that was what the District Court found when it did a conservative estimate of the loss. And I would note that the District Court only, of the 305 patients, we're talking about 1,100 certifications and recertifications out of more than 7,800 certifications. So we're talking about 14%. This is not every single patient that the defendant certified. This is a very small subset based on the extensive evidence that was unrebutted at the sentencing hearing and the defendant's own admissions. Unless the Court has any questions, I would ask that this Court affirm the loss and restitution calculations. The list that he's relying on are those 305 patients that he did not see when he certified and there was no billing record for. The face-to-face issue, which the defense brings up, is not relevant at all. So when you say he did not see, what we're talking about is they were not patients that were under his care prior to the certification. The face-to-face requirement came in later, although there was a period of time of the scheme that it was in place. But what 94C is saying is these are patients that the defendant has never billed for for visits, even though he certified them. So they could not have been under his care. And I would point this Court to the Patel decision. This Court in Patel went through a pretty thorough analysis. That was an anti-kickback statute case. This Court went through a very thorough analysis of what was required for home health certifications. And in Patel, this Court noted that a doctor must initially determine patients need the services and you need the patient's primary care physician to sign the Form 485. That's not what happened here. The home health agencies here told the defendant, here's what we want you to certify, and he did it, and he admitted that. And he's not their primary care physician because there's no evidence that he knows anything about these patients. And that's what 94C establishes. Those are the claims data combined with his admissions is what the District Court relied on. And I would also, essentially what the defendant is arguing is for precision. The defendant wants us to identify, go through every single patient, and say every 305 or all 7,800 certifications we have to go through and decide and say these people need home health care status, home health care, and these people don't. That's not what the law requires. That's not what the District Court was required to do. And the District Court even noted in his opinion, you know, precision is not required. A reasonable estimate of loss is what is required. The entire scheme also involved him receiving money back from the nursing homes for kickbacks? No, no, Your Honor. No, no. He was receiving money for signing the certifications under what's referred to as the G code. But by billing, by once he signs that certification, as this court noted in Patel, he's essentially the financial gatekeeper that these home health agencies could bill or could do all these services, but they can't bill Medicare or receive payment until he signs those forms. So he was getting paid for the certifications, but the home health agencies then with his certification were billing millions of dollars for home health care. And I would note that saying someone is homebound is part of the home health care determination. You have to be under the care of a physician who certifies it. That physician has to determine whether or not the patient has a taxing effort to leave the home and whether they need some sort of skilled nursing. So it's a combination. So to say someone isn't homebound, that is one part of the home health requirement. And what we were focusing on is the under-the-care-of-the-physician part of that requirement. And there's no evidence that any of these 305 patients were under his care at the time that they were certified. Thank you, counsel. Anything further, Ms. Mastroms? Judge Rovner, in response to a question you asked about the exhibits, the exhibits do not eliminate the possibility, these 94A, B, and C, that a nurse practitioner did visit the patient and he relied on it. And the sites for that are on page 14 of our brief, and I know there are sites elsewhere regarding how he had nurse practitioners. Was there a nurse practitioner? He had nurse practitioners who worked for him at various points of time. Your colleague is saying there were no nurse practitioners. The record reflects otherwise, and the sites are in our brief on that issue. But, frankly, even if there were no nurse practitioners, prior to 2011, he could learn about health care status through other means, and the government has just stood up and said there's no evidence that he didn't learn about health care status through other means. Well, that was part of his plea and his indictment. That was the government's burden. That is precisely our point, is they didn't meet a burden on that. But putting aside that for a moment, even if those health care certifications were fraudulent, it's still the case that the government did not produce any evidence that people didn't need the services. So, again, the prosecution comes up and says, well, the agencies told him who to certify, and he certified. Okay, he did testify to that. That would apply to some people. And let's be clear, we're not saying that the court has to be precise on this, but the fact of the matter is that the government is still assuming, with no evidence, that all of those 305 certifications were for people who didn't need care. They are assuming that the health care agency sent to Mr. Dahan people they thought needed care or wanted to have approved for care. He just signs off on it. Even if that's true, where's the evidence those people didn't need care? And the government suffers a loss if those people didn't, if the agencies are then billing for unnecessary treatment. And there's just no evidence of that. That was their burden of proof, and that is really, at the end of the day, much of what this case comes down to, the lack of meeting a burden of proof that any conduct by Mr. Dahan caused $2.8 million worth of loss. And the other thing I would add is the government took the position that all of these agencies were independent actors. They took it in the position in their briefs, and they took it specifically when the court said, are those agencies affiliated with Mr. Dahan? The government said, no, they were not. And, in fact, it said, no, they are not, and that's why he can't get set off for conduct if they appropriately billed. Well, if he can't get set off if they provide for their independent decision to provide necessary care, why is he liable if they provide unnecessary care? They're independent actors. Where's the but for proximate cause in that theory? I want to address one more point, which is that even if this court does not agree with all of Mr. Dahan's reasons as to why, none of this amount, he should be accountable for none of this amount, remand, at least on a limited basis, we would ask for because the government calls that $2.8 million both a billed and claimed amount, but then when it comes to restitution, they say it was paid. So there's no clarification in this record as to which it is. So, in our view, all of that money, there should be vacater and resentencing on just the $478,000 because that is the only amount that was proven, but if this court disagrees with that, we would ask at least for a limited remand for a hearing to clarify, is that $2.8 million just billed? Because that's absolutely not a loss if it was just a billed amount. It should be at least a reimbursed amount, or was it paid? And then proceed from there. Thank you very much. Thank you, Ms. Masters. The case is taken under advisement.